AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Eastern District of Louisiana

**SEALED**

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| | ) | Case No. |
| JERRY LASERICK PEA | ) | |
| JAMES JACKSON | ) | 18-65 MAG |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___March - May 2018___ in the parish of ___Tangipahoa___ in the ___Eastern___ District of ___Louisiana___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 846 | Conspiracy to possess with intent to distribute cocaine base and heroin |
| Title 21, United States Code, Section 841(a)(1) | Possession with intent to distribute cocaine base and heroin |
| Title 18, United States Code, Section 924(c)(1)(A) | Possession of a firearm in furtherance of a drug trafficking crime |

This criminal complaint is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

_____
Complainant's signature

S.A. William L. Johnson, III, D.E.A.
Printed name and title

Sworn to before me and signed in my presence.

Date: May 15, 2018

_____
Judge's signature

City and state:   New Orleans, Louisiana            Joseph C. Wilkinson, Jr., U. S. Magistrate Judge
Printed name and title

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, **WILLIAM LAWRENCE JOHNSON III**, being first duly sworn, hereby depose and state as follows:

1. I make this affidavit in support of a criminal complaint charging Jerry Laserick PEA and James JACKSON with possession with intent to distribute cocaine base and heroin, conspiracy to do the same, and using or carrying a firearm during and in relation to a drug trafficking offense, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and 18 U.S.C. § 924(c).

2. I am a Special Agent with the U.S. Drug Enforcement Administration (DEA), having been employed by DEA since July 8, 2000. I am currently assigned to the New Orleans Divisional Office and have been employed with the Iberville Parish Sheriff's Office in Plaquemine, Louisiana and assigned to the LEAD Narcotics Task Force for three years, first as a member of the Louisiana National Guard Counterdrug Program, and then as a sworn Sheriff's Deputy. During that time, I was involved in numerous investigations relating to the transportation and distribution of illegal narcotics.

3. As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

4. The facts and information contained in this affidavit are based upon my personal knowledge and information obtained from federal and state law enforcement officers. This affidavit contains what I believe to be the information necessary to support a finding of probable cause. The information contained in this affidavit is not intended to include each and every fact and matter observed by or known to the government.

## PROBABLE CAUSE

5. Since March 2018, the DEA Enforcement Task Force Group 2, along with the Tangipahoa Parish Sheriff's Office Narcotics Office (TPSO), the Hammond Police Department Narcotics Office (HPD), and the Department of Homeland Security (HSI), have been investigating Jerry Laserick PEA and James JACKSON, two known crack cocaine and heroin traffickers that live in the Hammond, Louisiana area. From March 2018 through May 2018, DEA Task Force Group 2 has conducted numerous controlled narcotics buys from PEA and JACKSON using a DEA Confidential Source (CS) and an HPD undercover police officer (UC), Samantha Guzzardo.

A.   **MARCH 9, 2018 CONTROLLED BUY**

6. On March 7, 2018, CS conducted recorded telephone conversations with PEA at PEA's known telephone number of (985) 500-5630 to confirm a narcotics transaction on March 9, 2018. On March 9, at approximately 2:00 p.m., Affiant, along with members of DEA Task Force Group 2, TPSO Narcotics Office, HPD Narcotics Office, and HIS, established surveillance around 47324 LOUIS LANE, HAMMOND, LOUISIANA, the known distribution house for PEA and JACKSON. Affiant and TFO Kohn Milton met with UC and CS and provided them with video and audio recording equipment, as well as $850 in Official Advanced Funds (OAF) to purchase narcotics.

7. At approximately 2:19 p.m., UC and CS, followed by surveillance agents, departed a pre-arranged meeting location and traveled directly to 47324 LOUIS LANE, with Affiant and TFO Milton following behind and monitoring the recording devices. Upon arrival, UC and CS headed inside the residence, where CS informed JACKSON of CS's interest in purchasing a "cookie" from PEA. Based on my training and experience, I know that "cookie" is a common street term for one ounce of crack cocaine. JACKSON advised that CS would have to wait until PEA arrived to purchase the "cookie." UC told JACKSON that she wanted to purchase heroin, and JACKSON sold her a quantity of heroin then and there. CS then asked JACKSON to contact PEA

to tell him that CS was present and ready to make the purchase, so JACKSON called PEA and informed him that "his people" were at the residence. JACKSON handed his phone to CS, CS conversed with PEA, and PEA instructed JACKSON to sell whatever CS and UC whatever narcotics he had.

8. JACKSON proceeded to retrieve narcotics from different places inside the residence and informed CS that all he had on hand for sale was two "8-balls" of crack cocaine, available for a price of "150 per ball." CS also asked JACKSON for some "brown," a common street term for heroin. JACKSON brought CS into the kitchen area and began to weigh out packets of heroin and crack cocaine. With the transaction completed, UC and CS departed the residence and drove back to a pre-determined meeting location to transfer all drug and non-drug evidence to Affiant and TFO Milton. CS and UC informed Affiant and TFO Milton that JACKSON had a gun with him during the transaction, and advised that the residence had a "drop bar" along the front and rear entrances of the trailer, as well as security cameras that were monitored from inside the residence. A drop bar is a bar or plank, placed in brackets, used to secure a residence and prevent rivals and/or law enforcement from entering. A field test was conducted on the suspected crack cocaine and confirmed the presence of cocaine. The drug evidence was sent to the DEA South East Laboratory for testing and final analysis. The suspected crack cocaine weighed approximately 33.2 gross grams, and the suspected heroin weighed approximately 33.5 gross grams.

9. Affiant and TFO Milton reviewed the video recording of the March 9th transaction and verified what appeared to be a semi-automatic handgun present during the transaction.

B. **MARCH 15, 2018 CONTROLLED BUY**

10. On March 15, 2018, following recorded telephone conversations between CS and PEA, Affiant and TFO Milton met UC and CS at a pre-determined meeting location to provide CS and UC audio and video recording equipment as well as OAF to purchase narcotics from PEA.

11.     Aerial surveillance was established over 47324 LOUIS LANE, HAMMOND, LOUISIANA, and at approximately 2:35 p.m., UC and CS, followed by Affiant and TFO Milton, departed the pre-arranged meeting location and headed directly towards 47324 LOUIS LANE. At approximately 2:40 p.m., UC and CS arrived and entered the residence, where both JACKSON and PEA were present. CS informed PEA that he wanted to buy "a cookie." PEA responded "a cookie of what?" and CS replied "crack." PEA stated that didn't have any "crack" nor any "powder." JACKSON stated "I got some boy right here, you want some boy?" Based on my training and experience, I know that "boy" is a common street term for heroin. UC asked for "two," and JACKSON gave her two small baggies of suspected heroin in exchange for $80.00 in OAF.

12.     CS asked PEA what CS could get for $850.00, and PEA instructed CS and UC to wait while he retrieved his heroin. At approximately 2:43 p.m., aerial surveillance observed PEA exit the residence and enter into a black passenger vehicle and depart the area. Affiant instructed the aerial surveillance unit to stay on PEA and monitor his location. At approximately 2:48 p.m., PEA arrived at a residence located at 15656 BECKY LANE, HAMMOND, LOUISIANA. PEA entered the residence through a side door, and a few minutes later, departed the residence and drove back to the LOUIS LANE residence. TFO Scott Jarreau identified the Louisiana license plate number as 892-BMS, and a database check of that license plate associated that plate with a black 2003 Honda Accord registered to Jerry PEA.

13.     Back on LOUIS LANE, UC asked CS if PEA went to go get the narcotics that CS had ordered, and JACKSON replied "Yes, for $850.00, I'd have to go get it, too." JACKSON instructed UC and CS about the need to be careful about who they sell drugs to. JACKSON stated that he and his brother (referring to PEA) are careful with who they deal with. JACKSON stated that he normally doesn't let anyone come into the residence and that he had a "big ass chopper" in

the back of the residence for protection. "CHOPPER" is a common street term for a semi-automatic rifle. JACKSON also pointed out internal surveillance cameras in the residence.

14. Upon PEA's return, he and CS completed the narcotics transaction. PEA told CS that he provided extra so that CS could "handle [CS's] business and make some money," and return to PEA for more. At approximately 3:00 p.m., CS and UC left the LOUIS LANE residence and, followed by Affiant and TFO Milton, returned to the pre-arranged meeting location. There, UC and CS transferred all drug and non-drug evidence to Affiant and TFO Milton. A field test was conducted on the suspected heroin, and the test confirmed the presence of heroin. The suspected heroin UC purchased from JACKSON weighed approximately 28.7 gross grams, and the suspected heroin CS purchased from PEA weighed approximately 39.1 gross grams. Both exhibits were sent to the DEA South East Laboratory for further analysis.

### C. MARCH 26, 2018 CONTROLLED BUY

15. At approximately 3:20 p.m. on March 26, 2018, Affiant and TFO Milton met CS and UC at a pre-determined meeting location in order to provide UC and CS with audio/video recording equipment, as well as $1,800.00 OAF to purchase narcotics from JACKSON and PEA. Both aerial and ground surveillance were established around 47324 LOUIS LANE, HAMMOND, LOUISIANA prior to UC and CS's arrival.

16. At approximately 3:25 p.m., UC and CS departed the meeting location, followed by Affiant and TFO Milton, and drove directly to 47324 LOUIS LANE. At approximately 3:30 p.m., UC and CS arrived at the LOUIS LANE residence, which had an orange-colored Jeep (Louisiana license plate number 208 ALM) parked in front of the residence. Agents have witnessed PEA in this vehicle on prior occasions and the Jeep is registered to Doris Marie DOKES, who is believed to be a girlfriend of PEA's.

17. CS and UC entered the residence, and CS asked PEA about the price for an ounce of heroin. When informed of the price, CS responded that CS didn't have that much money, so PEA replied that CS could take a "quarter" instead, meaning a quarter ounce of heroin. JACKSON then walked into the residence and told UC and CS that he had some "hard," a common street term for crack cocaine. PEA added that he had some "hard," too. JACKSON explained that his price was $700.00 for a "half hard," meaning a half ounce of crack. CS explained that he had $1,500.00, which PEA instructed could get him a "half hard" and a quarter of "boy"—meaning a half ounce of crack and a quarter ounce of heroin. CS asked to buy a "half a boy," but PEA replied that he didn't have that much. PEA told CS that a "quarter" would cost $350.00. CS purchased the quarter ounce of heroin from PEA and the half ounce of crack cocaine from JACKSON.

18. After completing the transaction, CS and UC departed the residence, returned to their vehicle, and proceeded to the pre-determined meeting location, followed by Affiant and TFO Milton. UC and CS transferred all drug and non-drug evidence over to Affiant and TFO Milton, and during the post-buy debriefing, UC stated that PEA again had a firearm present during the drug transaction. Affiant and TFO Milton reviewed the undercover video and observed a semi-automatic handgun present and within reach of PEA during the transaction. A field test was conducted on the crack cocaine and indicated the presence of cocaine. All drug evidence was then sent to the DEA South East Laboratory for final analysis. The suspected crack cocaine weighed approximately 44.3 gross grams and the suspected heroin weighed approximately 32.7 gross grams.

D. **APRIL 12, 2018 CONTROLLED BUY**

19. On April 12, 2018, at approximately 11:34 a.m., TFO Milton conducted surveillance at 15656 BECKY LANE, HAMMOND, LOUISIANA and saw, parked in the

driveway, the orange-colored Jeep known to be driven by PEA. At approximately 11:45 a.m., TFO Milton saw PEA walk out of the side door of 15656 BECKY LANE, walk to the jeep, and walk back inside the residence. At approximately 1:00 p.m., Affiant and TFO Jarreau reviewed recent "pings" of PEA's phone, which revealed that PEA had left BECKY LANE and visited the LOUIS LANE residence.

20. At approximately 2:00 p.m., Affiant directed the aerial surveillance unit to take a position over 47324 LOUIS LANE, HAMMOND, LOUISIANA to confirm PEA's presence at that location. The aerial surveillance unit confirmed that the orange-colored Jeep was present at the LOUIS LANE address, as well as the black Honda that PEA also uses. The aerial surveillance unit also witnessed several vehicles arrive to and quickly depart the residence, visits consistent with drug transactions.

21. At approximately 2:30 p.m., Affiant and TFO Milton met with UC and CS at a pre-determined meeting location to provide UC and CS with audio/video surveillance equipment and $2,000.00 OAF to purchase narcotics. At approximately 2:35 p.m., UC and CS departed the pre-determined meeting location, followed by Affiant and TFO Milton, and traveled directly to 47324 LOUIS LANE, entering the residence upon arrival. UC saw a semi-automatic handgun and numerous baggies of marijuana next to JACKSON. CS asked for "2 cookies" from PEA, referring to two ounces of crack cocaine. JACKSON replied that he had one to sell, and PEA replied that he could sell one, too. PEA asked CS how much "boy" CS wanted to buy, referring to heroin. CS replied that CS wasn't looking for "boy" but UC was, and PEA replied that he had some "good shit" on hand.

22. At approximately 2:41 p.m., a white male identified as "Devin" entered the residence. JACKSON provided Devin a bag of suspected marijuana, and PEA weighed a quantity

of suspected heroin to sell to Devin. PEA instructed Devin to be careful when using the heroin, adding that the "shit is heavy" and that another female customer was unable to walk immediately after taking some of that heroin. Devin replied that some "white" he had bought from PEA a few weeks earlier had caused him to go unconscious, and that it had knocked out his friend and that man's wife when they tried it, too. PEA held up the suspected heroin and informed all in the residence that "this stuff is dangerous; you have to be careful." At approximately 2:44 p.m., Devin departed.

23. JACKSON left the residence to retrieve the crack cocaine that CS had ordered, and aerial surveillance caught JACKSON walking to a wooded area just east of the residence and returning moments later. CS counted out $1,000 each for JACKSON and PEA for the crack cocaine. UC spotted a second semi-automatic handgun located on the floor of the front bedroom.

24. At approximately 2:49 p.m., CS and UC left the residence and, followed by Affiant and TFO Milton, returned back to the pre-arranged meeting location. CS turned over the suspected crack cocaine to Affiant, and CS and UC transferred all audio/video recording equipment to TFO Milton. Affiant and TFO Milton reviewed the undercover video and confirmed the presence of a semi-automatic handgun located next to JACKSON in the living room at the time of the narcotics transaction, and what appeared to be a semi-automatic handgun on the floor of the front bedroom of the residence. A field test was conducted on the suspected crack cocaine, and the test indicated the presence of cocaine. The suspected crack cocaine was sent to the DEA South East Laboratory for final analysis.

E. **MAY 4, 2018 CONTROLLED BUY**

25. On May 4, 2018, at approximately 12:59 p.m., Affiant and TFO Milton met with CS at a pre-arranged meeting location to provide CS audio/video recording equipment and

$1,200.00 OAF to purchase narcotics. Aerial and ground surveillance units had been placed around 47324 LOUIS LANE when CS, followed by Affiant and TFO Milton, traveled to that residence and found no one present. CS contacted PEA by phone, and PEA instructed CS to meet him at a Walgreens located near the LOUIS LANE residence. CS, followed by Affiant and other surveillance units, drove to the Walgreens, spotted PEA driving off in the orange-colored Jeep, called PEA, and at PEA's direction, returned to LOUIS LANE.

26. At the LOUIS LANE residence, PEA, with JACKSON present, weighed a quantity of crack cocaine and informed CS that because of a "drought" in Hammond, he was unable to provide any more. CS paid $700.00 for the crack cocaine, asked if PEA had any "brown," and paid $100.00 to PEA for the heroin. About 1:46 p.m., CS departed 47324 LOUIS LANE, followed by Affiant and TFO Milton, and drove directly to the pre-arranged meeting location, where he transferred the suspected heroin and crack cocaine to Affiant. A field test was conducted on the suspected crack cocaine, which indicated the presence of cocaine. The suspected crack cocaine weighed approximately 46.4 gross grams, and the suspected heroin weighed approximately 31.3 gross grams. Both exhibits were sent to the DEA South East Laboratory for final analysis.

\* \* \* \* \*

27. Based on the foregoing, I believe there is probable cause to believe that, within the Eastern District of Louisiana, Jerry Laserick PEA and James JACKSON did knowingly and intentionally possess with the intent to distribute cocaine base and heroin, and conspire to do the same, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and that they possessed firearms during and in relation to those drug trafficking offenses, in violation of 18 U.S.C. § 924(c).

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

*[signature]*
William L. Johnson III
Special Agent
Drug Enforcement Administration

Sworn to and subscribed before me on the 15th day of May 2018.

*[signature]*
HONORABLE JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE